**In re BLAIR CONTRACTING COMPANY, INC., Debtor.**

**Bankruptcy No. 76–855–BK–J.**

United States Bankruptcy Court, M. D. Florida.

June 30, 1982.

Marshall W. Liptak, Jacksonville, Fla., for debtor.

Rodger M. Moore, Washington, D. C., for U. S.

## MEMORANDUM OPINION AND ORDER

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court for consideration of the merits of claim number 127, filed by Everett B. Blair and Barbara D. Blair, his wife. As this has been an unusual and protracted case, the Court feels that it is appropriate to review the factual and legal history of the case, the present postures of the parties and the basis for the Court's decision herein.

## FACTUAL BACKGROUND

The debtor, BLAIR CONTRACTING COMPANY, INC., filed a Chapter 11 proceeding on November 30, 1976. The Company's plan of arrangement was confirmed on May 10, 1977 and, with one subsequent modification, the Company operated under the plan of arrangement until April 25, 1979, when, pursuant to agreement of the Debtor and its major creditors, the Court appointed a receiver to wind down the business and liquidate its remaining assets.

Among the Company's assets to be liquidated were a large number of tractor-trailers and heavy cranes used in the Debtor's business, which was specialized hauling and erection of precast concrete and steel. These assets were subject to a perfected security interest in favor of the Florida National Bank of Jacksonville to secure an indebtedness which, at the commencement of the Chapter 11, was in excess of $1,000,-000.00. This indebtedness to Florida National was personally guarantied by Everett B. Blair, the Debtor's president and sole stockholder, and his wife, Barbara D. Blair. The Blairs had also pledged certain personal assets to the bank to secure their guaranties.

During the course of the operation of the business under the Chapter 11 plan, the Bank made demand upon the Blairs to make payment under their guaranty. In July, 1978, Mr. and Mrs. Blair sold their personal residence and paid the proceeds ($50,000.00) to Florida National Bank to apply to the Debtor's loan. In September, 1978 the Blairs sold a parcel of commercial property on Talleyrand Avenue to the Jacksonville Port Authority and paid those proceeds ($283,422.84) to Florida National to further reduce the Company's debt. After application of these payments, the Company still owed Florida National approximately $283,000.00. The receiver, pursuant to vari-

ous orders of this Court disposed of the Bank's collateral at public and private sale for something in excess of $500,000.00, netting the estate approximately $490,000.00 after payment of sale expenses. Of this amount, approximately $283,000.00 was paid to discharge the remaining amount due to Florida National and the balance, approximately $207,000.00, together with subsequent accruing interest, remains in the estate and constitutes the subject matter of the present dispute.

Mr. and Mrs. Blair then filed their claim number 127, claiming to be subrogated to the lien rights of Florida National Bank to the extent of the payments made by the Blairs to the Bank under their guaranty. In other words, the Blairs claim that by paying the Bank, they stepped into the shoes of the Bank with respect to the collateral and became entitled either to the collateral or the proceeds of the collateral, represented by the funds now in the estate. The United States of America, being an interested party by virtue of claims filed by the Internal Revenue Service, and other creditors objected to the Blairs' claim among others. On June 25, 1980, this Court entered its Order finding that a particular group of unsecured creditors was entitled generally to priority of payment over the other creditors, which would exhaust the available funds. As to the Blairs subrogation claim, the Court held it was unnecessary to rule on the merits of the Blairs' claim "because it arose after confirmation of the plan."

The Blairs appealed this Order and on February 8, 1982, the United States District Court for the Middle District of Florida rendered its opinion reversing that portion of the June 25, 1980 Order and remanding to this Court for further proceedings to determine the merits of the subrogation claim. The District Court, relying on *Allen v. See*, 196 F.2d 608 (10th Cir. 1952) and *Fidelity and Deposit Company of Maryland v. Fitzgerald*, 272 F.2d 121 (10th Cir. 1959), held that the right to subrogation does not depend upon the timing of the payments in relation to the status of the bankruptcy proceedings and that this Court therefore erred in failing to rule on the merits of the Blairs' claim.

Subsequent to the remand, the Court scheduled a status conference at which the parties present requested the opportunity to present final oral arguments and to resubmit for the Court's review the memoranda, briefs and other authorities each were relying upon to support their position. On June 17, 1982, this Court held a final hearing at which time it gave each party present an opportunity to present additional testimony or other evidence and each side indicated it would rely upon the testimony taken and other evidence introduced at the 1980 evidentiary hearing on the objection to this claim.

THE POSITIONS OF THE PARTIES

Mr. and Mrs. Blair contend simply that they were compelled by the Bank, because of their personal guaranty, to pay the Company's debt. Therefore, they argue, they are subrogated to the rights of the Bank, including the collateral securing the Bank's indebtedness and, since that collateral has been turned into cash proceeds, they contend they are entitled to the cash proceeds themselves. The Blairs rely primarily upon *Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); *Fidelity and Deposit Company of Maryland v. Fitzgerald*, 272 F.2d 121 (10th Cir. 1959), *cert. denied* 362 U.S. 919, 80 S.Ct. 669, 4 L.Ed.2d 738 (1960); and *Allen v. See*, 196 F.2d 608 (10th Cir. 1952). In *Allen v. See, supra*, the Court states:

"It is well settled, that where one secondarily liable is called upon to make good on his obligation and pays the debt, he steps into the shoes of the former creditor. He becomes subrogated to all the rights of the creditor against the principal debtor, including the security given to secure the debt." 196 F.2d at 610.

The Court went on to hold that, following a sale of the collateral, the subrogee's rights attached to the proceeds.

"The bank was a secured creditor. He has a right to demand and receive from the trustee the security and, in the event of sale as here, the proceeds realized therefrom. When the guarantor stepped into the shoes of the bank by payment of the obligation, these rights were likewise his." Id. at 610–611.

The government, in objecting to the Blairs' subrogation claim, centers its objection on three specific issues. First, the government argues that the execution and delivery of the personal guaranty by Mr. and Mrs. Blair did not give rise to a valid debt from the corporation to the Blairs, but should be considered capital contribution and therefore subrogated to the rights of the other creditors. The government relies primarily upon a line of cases dealing with the debt-equity issues, most involving cases of disputed interest deductions on stock holder loans or bad debt deductions for stockholder loans. Second, the government argues that the doctrine of inherent fairness should be applied to prevent the principal stockholder of the debtor corporation from recovering on his claim while other creditors remain unpaid. The government relies primarily upon the case of *Midtown Produce Terminal, Inc.*, 5 B.C.D. 759 (10th Cir. 1979). Finally, the government raises a factual argument related to the sale proceeds themselves. Part of the assets of the debtor corporation sold by the receiver consisted of an operating authority or certificate issued by the Florida Public Service Commission, which empowered the debtor corporation to conduct its specialized heavy hauling business. Florida National Bank had no lien upon the operating certificate itself, as opposed to the tractors, trailers and cranes and the proceeds from its sale are not subject to the Blairs' subrogation claim. The government contends that the certificate had a value at least equal to the total sales price for the assets sold and that the subrogation claim consequently does not attach to any of the proceeds in the estate.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court concludes, based on the authority of *Allen v. See, supra,* and other authorities cited by Mr. and Mrs. Blair, that claim number 127 is a valid subrogation claim and that the Blairs are entitled to a secured claim in the entire remaining proceeds in the estate. The Court specifically rejects each of the grounds raised by the government.

First, the government's reliance upon the "debt-equity" tax cases is misplaced. This is simply not a debt-equity case. The debt-equity argument most often arises in connection with the initial capitalization of a corporation when the characterization of the stockholders' investment is later questioned because of interest deductions, bad debt deductions or a contest between the general creditors and the shareholder creditor. The cases relied upon by the government are all tax cases involving the tax treatment of such investment as loan or capital investment. Most of the cases involve direct payments by the shareholder to the corporation in exchange for either promissory notes or security agreements or some combination of stock and debentures. Numerous of the cases involved incorporations of on-going businesses where the assets of a partnership or proprietorship are transferred to the new corporation in return for a nominal amount of corporate stock and large amount of corporate debt. In those cases, the Court can readily see the basis for characterizing the so-called debt in the hands of the shareholder as capital investment. However, in the instant case, we are not dealing with a direct payment or direct loan by Mr. and Mrs. Blair to the company. Neither is it a voluntary payment, as is the situation in most debt-equity cases. It was a payment to a creditor, compelled by the existence of a personal guaranty. This distinguishes the instant case from the line of tax debt-equity cases relied upon by the government and puts it clearly into the category of cases such as *Allen v. See* and *Prairie State National Bank v. U. S., supra.*

The government seems to be arguing that the act of executing and delivering the

guaranty to the Bank constitutes, for tax purposes, a capital contribution rather than an indebtedness. Therefore, the government strenuously argues that there was no valid debt from the Debtor to Mr. and Mrs. Blair. The essence of the Blairs' subrogation claim is that there was a valid indebtedness to the Florida National Bank, the attributes of which, including the security, they now claim by virtue of their payment. The government has made no attempt to argue that no such debt existed to the Bank and it is undisputed, that the payments were made by Mr. and Mrs. Blair to the Bank and applied in satisfaction of the Company's debt.

The government also contends that the fact that theirs is a tax claim, gives rise to a different result than if the objection here was made by a general creditor. The Court is aware of no authority, and the government has cited none, for the proposition that the law determining the validity of a claim depends upon the identity of the party objecting. The Court finds that the identity or status of the objector has no relevance to the validity of the claim under consideration. See *In re Bessemer Materials, Inc.*, 225 F.Supp. 314 (N.D.Ala.1963) in which the Court states:

> "It is the nature of the claim—not the identity of the claimant, which is the pertinent inquiry. It is irrelevant whether the claim was acquired by written instrument or by subrogation, which is merely assignment by operation of law."

The Court believes the same rule is applicable to the identity of the objector and it is the nature of the claim that is the relevant inquiry.

Next, the government argues that it is inherently unfair for Mr. Blair, as principal shareholder of the company, to recover on his claim ahead of other creditors. Candidly, the Court is unsettled by the proposition of Mr. Blair receiving these funds while his company's creditors go unpaid and was in fact persuaded by this feeling in declining to rule on the merits of the Blairs' claim in the June 25, 1980 Order. The government cites *In re Midtown Produce Terminal, Inc.*, 5 B.C.D. 759 (10th Cir. 1979), for the proposition that insider claims are subject to special scrutiny and must withstand the test of inherent fairness. In *Midtown*, the Bankruptcy Court rejected a secured claim by the debtor corporation's sole shareholder and subordinated that claim to the claims of general creditors. The 10th Circuit Court of Appeals reversed, holding that the claim could not be subrogated merely because the claimant was the sole shareholder—a proposition in which Mr. and Mrs. Blair readily concur. On remand, however, the Court did state that the shareholder's claim would be subject to special scrutiny as to its inherent fairness. Initially, the Court notes that *Midtown* is distinguishable from the instant case on several points. First, *Midtown* involved a direct payment by the shareholder to the company in exchange for a security interest in all the company's receivables—its major asset—which were previously unencumbered. The payment was voluntary, that is it was not compelled by any personal liability of the shareholder to the other creditors. In the instant case, Blair was clearly under a compulsion because of his personal guaranty to make payment to the Florida National Bank. Furthermore, the collateral now claimed by Mr. and Mrs. Blair is identical to that already encumbered by the Bank. In other words, the subrogation claim is not any broader than the Bank's original secured claim. Accordingly, unlike in *Midtown*, the general creditors are no worse off in terms of the amount of the secured claim. Only the identity of the claimant has changed.

The Blairs have made a strong argument that, had they done nothing, or had they been able to delay the Bank in its demands on their guaranty, Florida National would have received the proceeds now in question, the general creditors would have received nothing and the Blairs would still have their personal assets. Not only is this position factually difficult to overcome, but, as stated by one Court, the estate should not "be given a windfall at the expense of its guarantor who is there in the time of the debtor's need." *In re U-Tec Institute, Inc.*, 4 B.C.D. 1032, 1033 (S.D.N.Y.1978). In con-

sidering the application of equitable principals to the shareholders subrogation claim in that case, the *U-Tec* Court declared that "it would be the reverse of equity" to deny the claimant his subrogation rights after having satisfied the obligation to the Bank. *id at* 1033.

To further distinguish *Midtown*, the Court notes that the government continually refers to Mrs. Blair's position as shareholder, officer and director of the company. The Court has reviewed the testimony and finds that Mr. Blair was the sole shareholder of the company from its inception. Mrs. Blair was at no time a shareholder of the company and was only intermittently an officer or director. There is not even a hint of evidence in the record that she was ever active in the operation of the business. The Court is also aware that the company, which began this Chapter 11 proceeding nearly six years ago with almost $3,000,-000.00 in debts is now left owing, after an orderly liquidation, substantially less than $500,000.00, not counting the Blairs' subrogation claim. Therefore, it is clear that Mr. Blair's efforts over the years have produced substantial benefit to the creditors as a whole, notwithstanding that they have not all been paid 100 cents on the dollar.

Moreover, while the Court recognizes that the ultimate burden rests with Mr. and Mrs. Blair on the validity of the claim, it is the burden of the objecting party to put forth some testimony to support its objection. While the government has eloquently argued the doctrine of inherent fairness, the Court perceives no evidence of misconduct, mismanagement, unfair dealing with the company or other inequitable conduct on the part of Mr. Blair and, certainly, no evidence whatsoever of such conduct on the part of Mrs. Blair. To the contrary, the government took great pains to illicit testimony from Mr. Blair to establish that he would not and did not do anything to injure the company's chances of succeeding in its reorganization efforts.

The government's final contention is that the proceeds in the hands of the Court represent proceeds from the sale of the operating authority, which was not subject to the lien claim of Florida National Bank and, consequently, the subrogation claim of the Blairs. The operating certificate was sold in a package deal together with the tractors and trailers for a lump sum price of $390,000.00 pursuant to an Order of this Court authorizing a private sale, after notice to all creditors and, in fact, with the consent of the creditors. The government argues that the certificate was worth more than the purchase price for all of the assets and therefore, none of the proceeds in the Court should be attributed to the sale of the tractors and trailers. While all the parties admit that the purchaser would not have purchased the tractors and trailers without inclusion of the certificate in the package, the Court is not willing to find that 15 Kenworth Tandem tractors and 23 trailers had no value whatsoever, in face of the fact that the Florida National Bank was still owed some $283,000.00, even after crediting the payments made by the Blairs. Mr. Blair admits in testimony that he felt the certificates were worth more than the buyer paid for them and placed them on their books at. The Court is not surprised that Mr. Blair thought his assets were worth more than they brought upon liquidation—a most common feeling among debtors in Chapter 11 proceedings. The government also points out that Mr. Blair had previously testified in a deposition that he felt the value of the operating authority was in excess of the price paid by the ultimate purchaser. Unfortunately, the record is devoid of any information concerning the date, time or place of this deposition, the issues being discussed, the valuation date or even the purpose for which Mr. Blair was being asked to value his assets. Nevertheless, the Court feels that the government has put forth sufficient evidence to raise a question concerning the valuation and shift the burden to the Blairs to identify the proceeds of the sale with the assets sold.

The Blairs, on the other hand, contend that "value" is irrelevant to the issue now before the Court. The Blairs are entitled, they contend, to the "proceeds" of the Bank's collateral which, admittedly, is the

entire fund now in the estate less the "proceeds" of the operating authority. They argue that, notwithstanding Mr. Blair's naturally optimistic view of the value of his company and its operating authority, the price for which it was sold, not his opinion of the value, is what determines the extent of the proceeds subject to the subrogation claim. Mr. Blair testified that the price paid for the certificate and the value at which was put on the buyer's books was $30,000.00 or $34,000.00". There is no contrary testimony. The Court finds that this testimony is consistent with the other documentation in the record and with the prior proceedings involving the sale of the certificate. The Court further notes that, as a part of those prior proceedings, the State of Florida, as a condition of authorizing and approving the transfer of the certificate to the buyer, required the payment of certain taxes, assessments and fees due to the State of Florida which, in effect, were in the nature of a lien upon the certificate. This Court, with the consent of the very creditors who now object, authorized the payment of those taxes and assessments out of the proceeds of the sale, to the extent of $45,000.00.

Therefore, the Court finds that, regardless of whether the label selected to describe this issue is "proceeds" or "value", all of the funds representing the certificate were paid to the State of Florida to satisfy its tax and assessment claims and no sums, representing proceeds or value of the certificates or operating authority are presently remaining in the estate.

Accordingly, the Court finds that:

1. There was a valid indebtedness of Blair Contracting Company, Inc. to the Florida National Bank of Jacksonville personally guaranteed by Everett B. Blair and Barbara D. Blair, his wife.

2. As a result of demand by the Bank, Mr. and Mrs. Blair paid in excess of $313,000.00 in reduction of the company's indebtedness to the Bank, which debt was subsequently paid in full by the receiver from the sale of the Banks' collateral.

3. Mr. and Mrs. Blair have a valid subrogation claim to the proceeds of the Bank's collateral, which constitutes the entire fund remaining in this estate.

THEREFORE, it is ORDERED that the objections to claim number 127, the subrogation claim of Everett B. Blair and Barbara D. Blair, his wife, are overruled and claim number 127 is allowed in full as a secured subrogation claim. The disbursing agent, Marshall W. Liptak, is hereby authorized and directed to pay the remaining funds in the estate to Everett B. Blair and Barbara D. Blair, his wife, and to promptly file notice of such payment with the Court.